## THIRD DEPARTMENT, NOVEMBER, 1924.

RUBY M. GORR, as Executrix, etc., of CHARLES H. GORR, Deceased, Appellant, v. ERIE RAILROAD COMPANY, Respondent.

*Railroads — crossing accidents — plaintiff's estator guilty of contributory negligence as matter of law — complaint dismissed.*

Appeal from a judgment of the Supreme Court, entered in the Sullivan county clerk's office on November 30, 1923, after a trial by jury, and also from an order entered on the same day. The jury found a sealed verdict improper in form in favor of the plaintiff, in that it provided for annual payments to the plaintiff instead of awarding a lump sum. The case had been tried twice before, resulting in a disagreement each time. The trial court being unable to send the jury back to correct their sealed verdict, acted upon a motion for nonsuit upon which he had reserved decision, and dismissed the complaint upon the theory that the negligence of plaintiff's testator was established as matter of law.

Judgment and order affirmed, with costs. All concur, except Hinman, J., dissenting in an opinion, in which Cochrane, P. J., concurs.

HINMAN, J. (dissenting): Plaintiff's testator was killed by an engine of the defendant company about six o'clock at night on the 28th of December, 1920, at a grade crossing in the village of Callicoon in Sullivan county. The deceased was a farmer, aged forty-two, who lived about four miles from the village. He had gone to the village to meet a passenger train due to stop there at about the time he was struck and killed. His brother had died and his body was being brought to Callicoon on that passenger train. It was not the engine of that passenger train that struck him, however, but the front one of two engines which were running together through the village without stopping and without any

52

train attached. The railroad runs easterly and westerly through the village. There was a village street to the north of the tracks and one to the south, each of these streets being nearly parallel to the tracks. There were business properties on both of these streets. Except for a wide detour, the only way to pass from one street to the other was by a grade crossing forty-four feet wide which connected them in the vicinity of the railroad station. The station was on the south side of the tracks, the side from which the deceased approached the place of the accident, and was west of the crossing a short distance. West-bound trains, however, discharged passengers and express upon a platform located a few feet west of the crossing and north of the tracks, that is, opposite the station. The west-bound main track, upon which this passenger train was coming which was to bear the body of deceased's brother, was the track nearest to this platform. It was upon this track also that the two engines in question were running west-bound. Just prior to the approach of these engines, the deceased was located somewhere south of the tracks and it was necessary for him to cross the tracks at this grade crossing to get to the platform where his brother's body would be discharged by the passenger train which was about due to arrive. Nobody testified as to just where he had been when he started to make the crossing. One witness who saw his approach said the deceased was coming up from a row of stores on the street which was south of the tracks and about twenty feet from the stores, when he first saw the deceased. The deceased was running fast as he ran past him and continued to run fast over the crossing. This witness with a companion was standing on the crossing about ten or fifteen feet south of a switch track which ran across it from the east to the station and upon which there were box cars to the east of the crossing. These witnesses swore that their view of the approaching engines was obscured by these box cars to such an extent that they did not see the engines until they were thirty or forty feet from the east side of the crossing although they had caught a fleeting glimpse of them eight hundred feet below through a narrow vista between the box cars and the firehouse. It is apparent from the testimony and seems undisputed that after the deceased passed this switch track his view in the direction of the approaching engines widened to at least one hundred feet from the east side of the crossing, and continued to widen as he advanced. When he was twelve feet southerly from the south rail of the east-bound main track his unobstructed view was at least two hundred and sixteen feet. His view increased as he proceeded beyond that point, which was about thirty feet from the place of the accident. At that point or nearer he was seen to hesitate and check his speed momentarily, but without being seen to turn his head to the right or left. Then he plunged on at the same or a faster pace than he had been running. He was running diagonally from about the center line of the crossing toward the point where the outside or northerly rail of the west-bound track met the extreme westerly edge of the crossing. It was at about that point that the accident occurred. The evidence and the inferences deducible therefrom most favorable to the plaintiff indicate that it was dark; that these engines were traveling about forty or forty-five miles per hour; that whistles were blown near a creamery located about one thousand nine hundred feet east of the crossing but that there were no other whistles blown for the crossing in question; that no bell was rung; that the headlight on the front engine was dim; that his view was obstructed in the manner above set forth; that he was running

fast; that the regular train which must slow down and stop was due; that possibly this entered into his calculations while he was running and when he momentarily hesitated and checked his speed just before crossing the main tracks; and, therefore, the inference may be that he looked when he hesitated and was deceived. There was sufficient evidence to go to the jury on the question of the defendant's negligence. Whether the negligence of the defendant was the proximate cause of the accident depends upon whether the deceased was guilty of contributory negligence. The burden of proof on the latter issue rested upon the defendant. (Civ. Prac. Act, § 265.) " If any possible hypothesis based on the evidence forbids the imputation of fault to the deceased, as matter of law, the question is for the jury." (*Chamberlain* v. *Lehigh Valley R. R. Co.*, 238 N. Y. 233, 235.) It is to be inferred that he knew something was coming and supposed it was the passenger train, but he may not have discovered it until he was seen to hesitate. His view was obstructed in the manner above described. In all probability he heard its approach as many of the witnesses at the trial did. He was partially deaf in one ear and he may not have heard it as soon as the others or perhaps not at all. It is plain that he was anxious to get across the tracks to receive the body of his brother at the platform. He may have started to run across because he knew the train was about due rather than because he heard the whistle at the creamery or the running noise of the engines. It is reasonably to be inferred that he supposed it would slow down and stop. If it had been so he would have had ample time to cross in safety. Instead, the engines traveled at the great speed of forty or forty-five miles an hour without stopping and even then struck him just as he was upon the last rail. In a case which we think is not distinguishable in principle, the court has considered, as bearing on contributory negligence, the right of a pedestrian at a crossing to rely upon a quite similar supposition that an interurban car was a local and would stop, without taking extra care to guard against accident in case it was a wrong supposition. The court held that the question should not be decided as one of law. (*Mullen* v. *Schenectady Railway Co.*, 214 N. Y. 300.) In that case the accident happened in the daytime. In the instant case it happened in the dark. Assuming that the deceased should have looked or that he did look we cannot say as a matter of law that he must have looked at any precise time or must have seen the engines in the dark with the headlight dim, or must have seen clearly enough to determine that it was not his passenger train. That he might have seen it in the daylight and have fully appreciate l his error is another matter. The absence of signals does not excuse lack of ordinary care on the part of the person injured, but what is ordinary care depends considerably upon the giving of warning signals. A person cannot be charged with failing to hear that which could not be heard nor with failing to correctly sense that which is seen if there is an absence of factors such as a warning bell or whistle or bright headlight which, if present, might have assisted in characterizing that which is seen. A dim headlight might have meant little, but couple it with a whistle, a bell and other factors and it might have been sufficient to give notice. These are matters of argument for the jury. In the circumstances of this case, it seems to be a fair hypothesis that when he suddenly heard the rumble of the engines or dimly caught sight of the headlight, he relied upon the supposition that it was the passenger train which he expected to slow down and stop and that he was not bound, as matter of law, to take extra care to guard against accident in

case it was a wrong supposition, or that he was otherwise deceived as to his danger because of the dimness of the headlight and the absence of whistle or bell or other warning. The judgment and order should be reversed and a new trial granted, with costs to the appellant to abide the event.

Cochrane, P. J., concurs.